DANIEL A. DALEY, administrator, *vs.* BOSTON AND ALBANY
RAILROAD COMPANY.

Suffolk.    January 19, 20, 1888. — May 7, 1888.

Present: MORTON, C. J., DEVENS, HOLMES, & KNOWLTON, JJ.

*Declaration — Amendment — Exceptions — Master and Servant — Railroad
Operation — Employee — Loss of Life — Negligence.*

A declaration reciting in one count two distinct causes of action is amendable so
as to set them forth in distinct counts, if the plaintiff intended to state and rely
upon both, although it thereby becomes demurrable.

At the trial of an action against a railroad company, for personal injuries to one
of a gang of laborers engaged in discharging coal from a vessel into the defend-
ant's cars, there was evidence that it was the vessel's duty, at its own expense,
to place the coal on the defendant's wharf, and that of the defendant to load it
upon its cars, both being done as one operation; that the engine and apparatus
used belonged to the defendant; that the defendant's dock-master had the gen-
eral control of the wharf, docked arriving vessels, employed the engineer and
foreman of the gang, and had employed and discharged others of the gang;
and that the vessel paid its dues to the defendant's cashier, who retained a part
for the use of the apparatus and gave the rest to the foreman for division among
the gang. *Held,* that a jury would be warranted in finding that the person in-
jured was in the employment of the defendant.

The transfer from a vessel to cars of freight to be forwarded is a railroad opera-
tion, within the meaning of the Pub. Sts. c. 112, § 212, as amended by the St. of
1883, c. 243, providing that a "corporation operating a railroad" shall be liable
for negligence resulting in the death of an employee.

The injuries were caused by the breaking of a defective rope, it being the duty of
the dock-master or his assistant to repair and replace such ropes, and of the
foreman of the gang to ask for a new rope if that in use was unsafe. The pre-
siding judge refused to instruct the jury, that, if it was the foreman's duty to
ask for a new rope and he knowingly omitted to do so, no recovery could be
had, but submitted to them the question whether it was the duty of the fore-
man and of the gang to get a new rope, or of the defendant to provide a proper
one. *Held,* that the defendant had no ground of exception.

TWO ACTIONS OF TORT. The first case was for causing the
death of Thomas Daley, the plaintiff's intestate, and the second
case was for his suffering before he died.

The original declaration inserted in the writ in the first case
was as follows:

" And the plaintiff says that the said deceased Thomas Daley
was, on or about the twelfth day of September last past, em-
ployed by the defendant as laborer, and was engaged in the hold
of a vessel, lying at defendant's wharf in said Boston, in filling

iron buckets with coal, in the process of unloading said coal from the hold of said vessel to said wharf. And that the defendant owned and controlled, and by its agents used and managed, an engine and hoisting apparatus, situated on said wharf, for raising said buckets filled with coal to said wharf. And the plaintiff says that the defendant operated and managed said apparatus and machinery negligently, unskilfully, and carelessly, and did not employ and have there suitable and proper ropes, in proper order and condition, and did not have and employ agents of proper knowledge and skill to operate and manage said ropes, engine, and apparatus; so that, while the said Thomas Daley was so engaged in the hold of said vessel, and while in the exercise of due care, and by reason of the carelessness and negligence of the defendant, and want of skill and care of its agents, and by reason of the defective condition of said ropes and machinery, one of said iron buckets, filled with coal, was dropped upon said Thomas Daley, and he was thereby so cut, bruised, maimed, and injured that he suffered great pain, and died two days or thereabouts thereafter."

The plaintiff filed a motion in the Superior Court, before trial, to amend this declaration by adding three counts, the first of which was as follows :

" And the plaintiff says that on the twelfth day of September, 1885, the defendant was a railroad corporation operating a railroad in said Boston; that said corporation was then and there engaged in its business and work of unloading coal from the hold of a vessel on to the defendant's wharf and into the defendant's cars on its railroad tracks; that the said business of removing said coal from said vessel into the defendant's cars was then and there in, and a part of, its business of operating its railroad, and that for the said work and business the defendant furnished and had in use a certain hoisting apparatus, consisting in part of an engine, a fall of rope, and large iron buckets; that said Thomas Daley was then and there an employee of the corporation, and at work in the hold of said vessel, in the said work and business of said corporation; and that on said day, by the negligence and carelessness of said defendant in not furnishing and having then and there a safe, suitable, and proper apparatus, especially a strong, safe, and proper rope for the said work and business, but

in having and furnishing a weak, unsafe, damaged, and improper rope, which broke, thereby causing a heavy iron bucket loaded with coal to fall upon said Thomas Daley while at work as aforesaid, and being in the exercise of due care, he the said Thomas Daley was killed. The said Thomas Daley left no widow, but did have and leave six children; and this plaintiff makes and brings this claim in this suit for the use of said children, according to the statute in such case provided."

The second count, which the plaintiff afterwards at the trial elected to strike out, set forth a cause of action under the statute for the death of the intestate through the negligence and carelessness of the defendant; and the third count, which was subsequently abandoned by the plaintiff, and the second action brought by him, set forth an action at common law for the suffering of the intestate.

At the hearing upon the motion, before *Mason*, J., there was evidence tending to show that the plaintiff intended, when he brought the action, to set forth and to rely upon a cause of action at common law, for injuries and sufferings of his intestate, and also a cause of action under the statute, for the death of his intestate. The defendant requested the judge to rule as follows:

" 1. That the declaration sets forth a good cause of action at common law, and does not set forth a good cause of action under the statutes. 2. If the court shall find as a fact that the plaintiff intended to bring his action for this cause, to wit, at common law, he cannot now be authorized to amend his declaration in the manner proposed by him, so as to set forth a new cause of action, together with the cause of action for which the action was originally brought. 3. If the court shall find as a fact that the plaintiff also intended originally to bring his action under the statute, as well as at common law, he cannot be permitted to amend in the manner in which he proposes to amend, because the two causes of action cannot be joined in the same suit."

The judge refused to pass on the rulings requested, except so far as was involved in allowing the amendments, and permitted the plaintiff to amend his declaration in accordance with the motion. The defendant alleged exceptions.

*Samuel Hoar*, for the defendant.

*J. B. Richardson*, for the plaintiff.

DEVENS, J. This bill of exceptions applies only to the first case. There was a motion made in the Superior Court· before trial, by the plaintiff, to amend the original declaration filed by him, with the writ, by filing distinct counts embracing the two causes of action, namely, for the loss of the intestate's life and for his sufferings prior thereto. By the bill of exceptions it appears that, at the hearing on the motion, "there was evidence tending to show that the plaintiff intended, when he brought the action, to set forth and rely upon a cause of action at common law for injuries and sufferings of his intestate, and also a cause of action under the statute for the death of his intestate." This evidence is fortified by an examination of the declaration itself, which must be construed as intending to include in one count two distinct causes of action, however imperfectly they, or one of them, may be stated. The presiding judge declined to pass upon several rulings requested by the defendant, except so far as they were involved in allowing the amendments which he permitted. To this the defendant excepted.

The rulings requested are to be examined only with a view of ascertaining whether they contain any legal proposition which in itself, or in connection with other facts appearing by the bill, rendered it erroneous to grant the plaintiff's application. A party is not entitled to rulings, correct in point of law as general propositions, which have no immediate bearing on the matter in dispute. *Fish* v. *Bangs*, 113 Mass. 123. As the original declaration itself, and the evidence before the judge, tended to show that the plaintiff intended to rely on both the causes of action stated, it must be deemed that by granting the amendment which permitted the plaintiff to restate them in distinct counts, the court decided that the plaintiff did thus intend. This must be held to have been involved in its decision, when nothing appears showing that it rested the leave to amend upon any other ground.

Even if it is true that the one cause, that at common law, was well set forth, and the other, that arising under and by virtue of the statute, but imperfectly so, this affords no reason why an amendment of the latter should not be made. An accurate statement is the object which the amendment seeks to attain. It is true, as the defendant contends, that the court cannot per-

mit a plaintiff to amend his declaration so as to sustain his action for a cause for which he did not intend originally to bring it, but the court was not required, at the, request of the defendant, to lay down this abstract proposition.   The argument of the defendant is, that the court may have found that the plaintiff did not originally intend to bring his action for the cause arising under the statute, as it refused formally to rule on the propositions requested.   A bill of exceptions is, however, to show affirmatively some error committed by the court below.   As it may well have been that the court may have found that the plaintiff did intend to bring his action under the statute, and as all inferences are to be in favor of the result reached by it in permitting the amendment, no ground of exception appears.

The defendant further contends, that the plaintiff could not be permitted to amend by putting two causes of action, which could not be thus joined, into one suit, and that such was the effect of the amendment.   The court had authority to permit the declaration to be so amended as properly to state the causes for which it was brought.   The effect of this amendment was not immediately in question.   If the result was that the declaration as thus amended was demurrable, or that the plaintiff would be compelled before proceeding to trial to abandon one or the other count, that was a matter to be thereafter decided.   The entry must therefore be,                          *Exceptions overruled.*

THE cases were tried together in the Superior Court, before *Thompson*, J., who allowed a bill of exceptions, in substance as follows.

Thomas Daley, the intestate, was a shoveller, and one of a gang of men who were at work, on September 12, 1885, in the hold of the schooner John H. Kranz, then lying at the Grand Junction Railroad Wharf in East Boston with a cargo of coal, there to be delivered for carriage in the defendant's cars to Brookline. Upon the wharf was a coal-run, under which were several tracks for the cars of the defendant.   Upon this coal-run stood a stationary engine, from the drum of which a rope or fall ran to the masthead of the schooner through a block or pulley, called a gin, and down through a hatchway into the hold of the schooner. To this fall was attached a large iron bucket, which was filled

with coal by the gang of shovellers in the hold. One of the gang, called a stage-man, stood on a stage projecting from the run, and signalled the engineer of the stationary engine to hoist or lower the bucket, the coal when hoisted being emptied by him into a barrow, wheeled across the run, and dumped into a car standing underneath upon the track. On that day the rope or fall was rotten and unfit for use, and a bucket loaded with coal, while being hoisted thereby, fell and struck Daley, and inflicted injuries from which he died three days afterwards. The Grand Junction Railroad Wharf, tracks, cars, coal-run, stationary engine, stage, barrows, fall, gin, and buckets were the property of the defendant. The defendant did not contend that there was any contributory negligence on the part of Daley.

Evidence was introduced tending to show that one Thornton, in the employment of the defendant, had charge of the Grand Junction Wharf and of the coal-run; that he took charge of the vessels as they came in and put them into their berths; that he told the gang, when the vessels were ready to be discharged, to go ahead with the unloading; that on one occasion he discharged the whole gang, and then took them back; that he told the gang when to go to work and when to stop; that he hired the stage-man, one Gallagher, who was the foreman of the gang, as well as other members of the gang; that the gang were paid by the ton for unloading a vessel, according to the weight of the coal or the bill of lading, and were not paid off until the whole vessel was discharged; that no one had anything to do with the unloading except the engineer of the stationary engine, the stage-man, and the gang; that Gallagher received the money for unloading a vessel from one Beale, the cashier of the defendant, in its freight office in East Boston, and divided it among the gang; that, in the absence of Gallagher, the shovellers got the money at the freight office, and divided it up among themselves; and that the engineer of the stationary engine was in the employment of the defendant.

Beale testified that he was in the defendant's employ, as the cashier at its wharf in East Boston; that he received from the captain of the John H. Kranz payment for taking the coal out of her at the rate of twenty-five cents a ton, out of which he paid off the gang through its foreman, and also paid the defend-

ant for the use of the engine, tackle, and fall; that the engineer of the stationary engine was an employee of the defendant, and was let with the engine to the vessel; that all the employees of the defendant were paid by its regular paymaster; and that he had nothing to do with paying the employees of the defendant.

Thornton testified that he was in the employ of the defendant, as the dock-master in charge of the Grand Junction Wharf; that he attended to the docking of the vessels as they arrived; that he had nothing to do with employing the shovellers; that with regard to the stage-men, in the interest of forwarding the work along, he saw that they got their orders to go ahead and put out the coal; that if there was any delay they were to report to him; that he had nothing to do with the original employment of them, or with getting or selecting the men; that it was the business of the stevedores to attend to the selection of the men; that he never hired Gallagher, and never discharged him; and that he never hired a new man, but sometimes told them that, if they could not settle it themselves, he would get a new man.

Evidence was also introduced tending to show that the fall which broke had been in use for six or seven months; that one Carey, who was in the defendant's employ as an assistant to Thornton, had charge of the ropes, and of fitting, repairing, splicing, and replacing them when necessary; that Carey kept other falls, which were sound and strong, on the wharf ready for use, and accessible to the gang; that each gang had its own fall; that it was the duty of Gallagher to ask Thornton for another fall if he considered the rope in use to be unsafe and dangerous, and likely to break; that it would have been evident to any one on examination that the fall which broke would break, and was not fit for use; and that after the accident a new rope was put in.

The defendant requested the judge to rule and instruct the jury that, " 1. Upon the evidence the plaintiff cannot recover in either action. 2. There is no evidence of any authority from the defendant to Thornton to employ men as shovellers. 3. Upon the evidence the work of unloading coal from the schooner John H. Kranz was not a railroad operation. . . . 5. If there was another rope or fall accessible to Gallagher, or which he could have had by inquiring for it, and it was his duty to get it or ask for it upon his discovering the weakness of the one in use, and

he negligently omitted to do so, and went to work, and by reason of the omission the accident occurred, the plaintiff cannot recover in either action."

The judge refused so to rule, and instructed them, among other things, that it was for the jury to consider and determine "whether or not this gang of men who were discharging this schooner, the John H. Kranz, were, when they were discharging this cargo, in the employ of the defendant corporation, or in the employ of the schooner"; that "if the schooner undertook the discharge of the cargo, employed the men, hired the engine and the engineer, and took control of them, then it is its discharging; if, on the other hand, the defendant corporation hired the men, and they took for convenience, or for any other reason, the discharge of this cargo upon themselves, and were paid for it by the schooner, then it is their act"; that "if these men were at work for the defendant corporation in taking coal from the schooner and putting it on to the wharf, or into the cars, then they were engaged in the business of the corporation"; that it was a question for them whether or not it was a case "where it was the duty of the workmen — that is, of the gang — the duty of this gang to see to it that this was a suitable and proper fall, and in case of its not being one, to go and get another"; and concluded as follows: "As I said in the first place, if these men were not in the employ of the defendant corporation, but were in the employ of the schooner, hired by the schooner; — and when I say 'hired by the schooner,' I don't mean through the Boston and Albany Railroad; because if the Boston and Albany Railroad has these men, and goes there and does the work with these men, and is paid for it, why, they are then in the employ of the Boston and Albany Railroad Company. If, on the other hand, the Boston and Albany Railroad did not hire those men, and they are at work for the schooner, then they are in the employ of the schooner, and the corporation is not responsible for them, and not liable in this action."

The defendant thereupon objected to the above instructions, and the judge further instructed the jury, that, "if the Boston and Albany Railroad Company hired these men, if they were in their employ, and, being in their employ, they put them at work there to discharge this cargo, and, as their servants, they dis-

charged this cargo, then they would be the servants of the defendant corporation; and I also rule that, taking this to do and doing that, in doing that they would be engaged in the business of the corporation"; that, " if the Boston and Albany Railroad had these men to let, and this schooner went there and hired these men of the company, made a contract for these men, and took these men there as their own men, and in their employ, in the employ of the schooner, that would be sufficient to show these men to be in the employ of the defendant; but it must appear that these men were in the employ of the Boston and Albany Railroad Company, in the performance of their work in the discharging of this coal, — that is, that this coal was discharged by the Boston and Albany Railroad Company, and not discharged by the schooner"; and that " where there is used such kind of appliances that from time to time it is necessary to supply a part or a portion, and the material for that supply is provided by the corporation, if it is the duty of the men who are employed, or either of the gang, — Gallagher, or either of them, — if it is their duty in the gang, or if it is the duty of either of them, to get and replace these themselves, then of course they cannot recover, because it would be a failure to perform their duty, or the failure on the part of a fellow servant to perform his duty. And I left it to you to say, under all the testimony here, whether or not this was the duty of the gang, or whether it was the duty of the defendant corporation to supply this fall, and reasonably to look after it and see that it was in a reasonably safe and proper condition for use."

The jury returned a verdict for the plaintiff in each case; and the defendant alleged exceptions.

*Samuel Hoar*, for the defendant. 1. It is submitted that Gallagher was a stevedore, and that he was " exercising a distinct business, under an entire contract, for a gross sum," and that the relation between the gang and the defendant was that of contractor and contractee. *Linton* v. *Smith*, 8 Gray, 147. *Forsyth* v. *Hooper*, 11 Allen, 419. *Murray* v. *Currie*, L. R. 6 C. P. 24.

2. The plaintiff must show, not only that the injury was the result of the negligence of the defendant, but that it was the result " of the negligence or carelessness of a corporation operating a railroad." Pub. Sts. c. 112, § 212. The business of unloading vessels is that of stevedores, and not of railroad cor-

porations, and the negligence alleged was not that of a corporation operating a railroad.   *Claxton* v. *Lexington & Big Sandy Railroad,* 13 Bush, 636.

3. A corporation must act through its servants and agents, and perform its whole duty by furnishing sufficient materials, and selecting competent persons to keep its machinery and appliances in a safe condition.   Where a defect calls for repair of a permanent character, the master cannot free himself from responsibility by delegating his duty to a servant, but must see that he performs that duty.   *Ford* v. *Fitchburg Railroad,* 110 Mass. 240.   *Holden* v. *Fitchburg Railroad,* 129 Mass. 268.   *Rogers* v. *Ludlow Manuf. Co.* 144 Mass. 198.   But the making of such ordinary repairs as the use of the machine requires to keep it in order from day to day may be intrusted to servants; and, by employing competent servants for that purpose, and supplying them with suitable means, the master performs his duty.   *McGee* v. *Boston Cordage Co.* 139 Mass. 445, 448.   *Rice* v. *King Philip Mills,* 144 Mass. 229, 236.   In a case precisely similar to the case at bar, it was held that a defect identical with that here in question comes within the latter class.   *Johnson* v. *Boston Tow-Boat Co.* 135 Mass. 209.

It is clear that the defendant had performed its whole duty to the intestate, — had supplied suitable materials, and employed competent men to make the repairs necessary.   *King* v. *Boston & Worcester Railroad,* 9 Cush. 112.   *Zeigler* v. *Day,* 123 Mass. 152.   *Smith* v. *Lowell Manuf. Co.* 124 Mass. 114.   *McDermott* v. *Boston,* 133 Mass. 349.   *Loughlin* v. *State,* 105 N. Y. 159.

4. The fifth request for instructions ought to have been given as requested.   If the jury should find that it was the duty of Carey or Thornton " to get and replace " the new fall, on being notified by Gallagher, or any one else, of the necessity for so doing, they would be fellow servants of the plaintiff's intestate, precisely as Gallagher would have been if it were his duty, and the plaintiff could not recover for negligence on the part of Carey or Thornton in that case.   Yet, under the instructions given, the jury must find for the plaintiff, if the duty of getting and replacing was not on the members of the gang, even though Thornton or Carey, having the duty of getting and replacing, were free from negligence.

*J. B. Richardson,* for the plaintiff.

DEVENS, J.   This bill of exceptions was taken in both cases, which were tried together.   As the cases were tried, the first action was to recover damages for the loss of life of Thomas Daley, the plaintiff's intestate, by his administrator, for the use of his children, Daley leaving no widow; the second action was to recover damages for the suffering of Daley previous to his decease.

The fundamental question was, whether the plaintiff's intestate, when the injury occurred, was an employee of the defendant. That it was the duty of the schooner to place the coal on the wharf of the defendant, and to bear the expense thereof, was admitted; it is also equally clear, that the work of loading it into its cars belonged to the defendant.   The two operations were performed as one, although successively; the coal as it was hoisted from the schooner being put into the barrows of the defendant to be carried to its cars.   The engine and all the apparatus used belonged to the defendant, and the engineer was its servant.   The dock-master of the defendant, one Thornton, had the general direction and control of its wharves at East Boston, and was assisted by one Carey.   He assigned the berths to the schooners as they arrived; he employed the foreman of the gang (known as the stage-man), who unloaded the schooner, and who was also paid by the defendant, and gave him directions when to proceed and put out the coal.   If there were any delay in the work, it was the duty of the stage-man to report to him.   There was also evidence that the schooner paid twenty-five cents a ton for discharging the cargo to the defendant's local cashier, who retained for the defendant a certain portion for the use of its apparatus, and delivered another to the foreman of the gang which unloaded the vessel, who divided it among the men.   The work of unloading the schooner John H. Kranz, in the course of which Daley was injured, proceeded in this way.

The defendant asked the court to instruct the jury that there was no evidence of any authority from the defendant to Thornton to employ men as shovellers.   This should not have been given.   There was evidence of a general authority on his part as to the unloading, from which such authority might be inferred, and it was also immaterial whether the men were employed by Thornton, or by some one else, entitled to act for the defendant. The material question was, whether these men were actually in

the employ of the defendant corporation. If the corporation was actually doing the work of unloading the vessel, having charge and direction of it through its upper servants, authorized to control the laborers engaged in it, and was also receiving pay from the party bound to bear the expense of it, those engaged in it were its servants. It cannot make any difference whether the men employed were hired by it for the month or year, or job, or whether they received a fixed sum, or a portion of the sum received by the defendant from the schooner, if they were entitled to look to the defendant, and not to the schooner, for their compensation. The instructions were in accordance with this, and there was certainly evidence (although upon this point there was conflict) that Thornton employed other men than Gallagher, the foreman or stage-man; that he discharged the whole " gang," as it was termed, of shovellers at a time previous, and afterwards took them back; that he refused employment to some men; that he had control of the run or platform; and that he directed men when to go on and when to stop work.

The defendant contends that the evidence, if anything, showed a relation of contractor and contractee between the gang and the defendant, and that such should have been the ruling. This position does not appear to have been taken at the trial, nor did the defendant desire to have the inquiry submitted to the jury, whether the laborers were not independent contractors, performing a particular job contracted for by their foreman. If it had been so submitted, the evidence that the engineer and stage-man were directly hired by Thornton, and in a general way directed by him, together with the other evidence above recited, would fully have justified a finding that the relation of master and servant existed between the defendant and the laborers. The answer to the inquiry whether Daley and the gang of laborers were the servants of the defendant, depended upon numerous circumstances, more or less disputed and complicated, and was properly left as a question of fact to be decided by the jury.

The defendant further contends, that, as the business of unloading vessels is a business distinct from that of operating a railroad, even if the injury was the result of the negligence of the defendant, it cannot be held to be the result " of the negligence or carelessness of a corporation operating a railroad." Pub. Sts.

c. 112, § 212.   St. 1883, c. 243.   The Pub. Sts. c. 112, § 212, provide that, when the life of a passenger, or of a person being in the exercise of due diligence and not a passenger nor in the employment of such corporation, is lost " by reason of the negligence or carelessness of a corporation operating a railroad or street railway, or of the unfitness, or gross negligence, or carelessness of its servants or agents while employed in its business," not less than $500, nor more than $5,000, may be recovered by indictment to the use of certain persons named.   The second clause of the same section provides that, " if the corporation is a railroad corporation, it shall also be liable in damages," not exceeding $5,000, nor less than $500, in an action of tort, to the executor or administrator to the use of the same persons specified in the indictment.   It is provided that only one of these remedies can be availed of.   The St. of 1883, c. 243, amends this section by inserting after the provision as to an indictment, " and if an employee of such corporation, being in the exercise of due care, is killed under such circumstances as would have entitled the deceased to maintain an action for damages against such corporation, if death had not resulted, the corporation shall be liable in the same manner and to the same extent as it would have been if the deceased had not been an employee."   The words " operating a railroad," in the Pub. Sts. c. 112, § 212, describe the kind of corporation intended to be subjected to the liability there imposed, and not the work immediately in the process of performance by it. Even if they could be held to limit the liability to occasions where the railroads are being actually operated, they would not limit it to accidents occasioned by locomotives, moving trains, etc., or only upon its tracks.   The handling of its freight, the loading and unloading of its cars, or the transfer, as in the case at bar, of freight from a vessel to its cars, are railroad operations.

The defendant further urges, that it is clearly shown that the defendant discharged his whole duty to the plaintiff's intestate, and that there was no evidence of negligence on the part of the defendant which could properly be submitted to a jury.   This argument is upon the theory, that the only contention that could have been made by the plaintiff was that the defendant was negligent in not supplying a suitable and safe fall, and that as to that matter the defendant did its whole duty.   It is the duty of

the master to exercise ordinary care in supplying and maintaining machinery, appliances, and instrumentalities; and if the servant exercising ordinary care is injured by a deficiency therein, he is entitled to recover damages. The servant charged with providing these appliances stands in the place of the master, and performs the duty incumbent on him. It is not sufficient that he is an intelligent and competent servant; if he neglects this, the master is still responsible, unless he shall himself have exercised a reasonable care and supervision over him in seeing that the machinery was in proper condition. Nor is it enough that the master has employed suitable servants, and furnished them with suitable materials, and instructed them to keep the machinery in repair. He must see that such servants do their duty. *Elmer* v. *Locke*, 135 Mass. 575. *Rogers* v. *Ludlow Manuf. Co.* 144 Mass. 198. The making of such ordinary repairs as the machine requires from day to day, and which are intended to be done as a part of its operation by those engaged in running the machine, may be intrusted to them, or to some among them; and if the master employs competent servants for that purpose, and supplies them with suitable means, the master performs his duty. Such servants are fellow servants with those employed only to use the machine. *Johnson* v. *Boston Tow-Boat Co.* 135 Mass. 209. *McGee* v. *Boston Cordage Co.* 139 Mass. 445.

The injury in the case at bar occurred, not from the careless handling or management of the fall, but from the defective character of the rope used. There was ample evidence that it was the duty of Carey, who was the assistant of Thornton, to repair, splice, and fit the ropes used. Each gang of men had its own fall. The defendant has argued, that, even if it was the fault of Carey or Thornton that a defective rope was used, it was the negligence of a fellow servant, who was provided with suitable material, (as there was an additional fall at his disposal,) and who was himself a competent man. We do not perceive that the defendant took the position at the trial that Daley, the deceased, was a fellow servant of Carey or Thornton. It relied on the fact that Gallagher might have got a new fall by asking for it, and that, as he or the gang of which he was foreman did not ask for it, the plaintiff could not recover. Its fourth request was: " If there was another rope or fall accessible to Gal-

lagher, or which he could have had by inquiring for it, and it was his duty to get it or ask for it upon his discovering the weakness of the one in use, and he negligently omitted to do so, and went to work, and by reason of the omission the accident occurred, the plaintiff cannot recover in either action."

The judge, in his charge, submitted to the jury the inquiry whether, as the workmen were employed, it was their duty, if the rope became apparently weak, or gave out, to go and get a new one to replace the old one, and whether such had been provided at a convenient place by the defendant, or whether it was the duty of the defendant corporation to see that a proper rope was provided.  He also, in answer to the objection of the defendant to the part of the charge relating to the inquiry whether it was the duty of the men to see that the rope was a proper one, and, if not, to get another, restated the general principle with regard to men in the employ of another in these words : " Where there is used such kind of appliances that from time to time it is necessary to supply a part or a portion, and the material for that supply is provided by the corporation, if it is the duty of the men who are employed, or either of the gang, — Gallagher, or either of them, — if it is their duty in the gang, or if it is the duty of either of them, to get and replace these themselves, then of course they cannot recover, because it would be a failure to perform their duty, or the failure on the part of a fellow servant to perform his duty.  And I left it to you to say, under all the testimony here, whether or not this was the duty of the gang, or whether it was the duty of the defendant corporation to supply this fall, and to reasonably look after it, and see that it was in a reasonably safe and proper condition for use."  To which the defendant excepted.

We do not see why the request of the defendant was not substantially complied with.  Both the request and the instruction, assuming that the fall was defective, place the responsibility on the gang, if it was the duty of Gallagher or the gang to replace it or see that it was replaced, and the means of replacing had been provided by the corporation.  The request is, that if the rope or fall was accessible, and Gallagher could have had it by inquiring for it, and it was his duty to get it or ask for it on discovering, etc., then the plaintiff cannot recover.  The instruction

does not use the words "ask for it," but it clearly denies to the plaintiff the right to recover, if the duty of seeing that the rope was sound, and if not sound of replacing it, rested upon Gallagher or either of the gang, and the means were accessible.

The defendant urges that the instruction given was erroneous on this point, because it says, "If the jury should find that it was the duty of Carey or Thornton to" get and replace "the new fall, on being notified by Gallagher or any one else of the necessity for so doing, they would be fellow servants of the plaintiff's intestate, precisely as Gallagher would have been if it were his duty, and the plaintiff could not recover for negligence on the part of Carey and Thornton in that case." This is not a sound argument. The instruction requested and that given dealt only with the duty of the gang or its foreman, on the one side, and the corporation on the other. The judge did not undertake to define what were the relations of Carey and Thornton, and to what extent the corporation would be responsible for their acts or neglect. The defendant had requested no instruction upon the theory that Carey or Thornton, if they had neglected their duty, — it being their duty to see to it that the fall was in good condition, — were still fellow servants of the plaintiff, and therefore that he could not recover. It contends that, under the instructions given, the jury must find for the plaintiff, if the duty of getting and replacing the rope was not on the gang, even though, having the duty of getting and replacing, Thornton and Carey were free from negligence. Nothing of this sort is said by the presiding judge. The case was, without doubt, tried on the theory, of which there is ample evidence disclosed by the exceptions, that there was great negligence on the part of some one in permitting a gang of men to go to work provided with so wretched a rope, and that this negligence was either the fault of Gallagher, who had the immediate control of the work of the laborers, and directed the actual performance of the work, or of the servants of the defendant, Carey and Thornton, who had no share in the actual work, but through whom the appliances and instrumentalities for the work were supplied. If it was the fault of the latter, the defendant does not appear to have controverted its responsibility. If the defendant had desired instructions as to the responsibility of the defendant

for Carey and Thornton, they should have been asked. Nor does it appear that instructions on this subject were not given by the presiding judge, as only so much of his charge is reported as relates to the exceptions taken.

The instructions given, in answer to the fifth request of the defendant, were sufficiently favorable to the defendant. Whether, if Gallagher had been guilty of neglect in seeing to it that the rope was sufficient, and, observing that it was insufficient, in failing to get and replace it by another, this was to be considered the neglect of a fellow servant strictly, which would deprive the plaintiff of his right to recover, or of the master, who had intrusted the duty to Gallagher, it is not now necessary to discuss, in view of the instructions given.

In *Johnson* v. *Boston Tow-Boat Co.* 135 Mass. 209, it was held that, where three men worked together on a small boat which was provided with a rope to replace that in actual use as it might become decayed, and one was the foreman " to superintend the labor of the men and the use and condition of the apparatus upon his boat," the negligence of such foreman was the neglect of a fellow servant. But there is a difference, and there may be a legal distinction between that case, where something is necessary to be done from time to time to keep a machine in working order, as by replacing a rope, and where the foreman is provided with, and has in his own control, the means of doing this, and one in which it is his duty to apply for and thus obtain the means of replacing a rotten rope. In the first it is a part of his duty, in working the machine, to stop it from time to time for the purpose of repairing it from the materials in his hands; but if he is only to get the materials by asking for them, even if it is made his duty to ask, the control of the repairs is with those who are to provide the machinery, rather than those who are to work it. It might be for them to determine whether the machine should be stopped and the repairs made, and the neglect of the foreman to report its condition might perhaps be treated rather as a neglect of the master, who is to provide suitable machinery, than of the servant, whose duty it is to handle it properly.

It was not contended that the plaintiff's intestate had any knowledge of the weakness of the rope. The facts, out of which

the duties of Gallagher and the gang, on the one side, and of Thornton, Carey, and the defendant, on the other, arose, were in dispute. What were those duties respectively depended on these facts, and under proper instructions it was for the jury to determine what those relations were. *Clark* v. *Soule*, 137 Mass. 380. Under the instructions as given, the jury must have decided that it was the duty of Carey and Thornton to see to it that there was a sufficient rope in the fall provided for the use of the gang to which the plaintiff's intestate belonged, and that the neglect so to do was that of the master.

*Exceptions overruled.*