**Kristoffer Edward OLSEN, Respondent (C8–84–1163), Relator (C1–84–1165),**

**v.**

**Joseph KLING d.b.a. K4M Company, Relator (C8–84–1163), Respondent (C1–84–1165),**

**and**

**Western National Mutual Insurance Company, Relator (C8–84–1163), Respondent (C1–84–1165),**

**Minnesota Department of Public Welfare, intervenor, Respondent,**

**State Treasurer, Custodian of the Special Compensation Fund, Respondent.**

**Nos. C8–84–1163, C1–84–1165.**

Supreme Court of Minnesota.

March 1, 1985.

Rehearing Denied April 2, 1985.

Donald G. Clapp, St. Paul, for Olsen.

Dianne E. Walsh, Kristin B. Maland, Minneapolis, for Western Nat. Mut. Ins. Co.

Gail Olson, Sp. Asst. Atty. Gen., St. Paul, for Dept. of Public Welfare.

Robert Gubbe, Minneapolis, for Kling.

Thomas Lockhart, Sp. Asst. Atty. Gen., St. Paul, for Custodian of the Special Compensation Fund.

## OPINION

PETERSON, Justice.

Joseph Kling and Western Mutual National Insurance Company seek review of a decision of the Workers' Compensation Court of Appeals affirming an award of benefits to Kristoffer Olsen for permanent total and permanent partial disabilities. Kling and Western challenge findings that Olsen was Kling's employee, that Olsen was earning a weekly wage of $500 on the date of injury, and that he sustained an 80 percent permanent partial disability of the back. Olsen also seeks review of the decision, contending that the compensation judge and the WCCA erred in deferring payment of compensation pending resolution of a district court action to determine whether Western is obligated to furnish Kling insurance coverage. We affirm the challenged findings of fact, and reverse the finding and order relating to deferment of payment of compensation.

1. The issues which Kling and Western raise require a brief summary of the evidence. The record indicates that shortly before the time of injury Olsen, who had been laid off by his employer, asked Kling if he knew of any available work. Kling, who had decided in early 1980 to go into the business of roofing and remodeling, asked Olsen if he wished to work on a roofing job. Kling also testified that he had not figured the costs of his materials yet, but would pay a "fair wage." Olsen agreed to work on the project.

On June 26, 1980, Kling obtained and posted a building permit on the premises, a house in south Minneapolis, and arranged for delivery of roofing materials to the site. Through his brother he also contacted his insurance agent to request that workers' compensation insurance coverage be bound. On June 27, Kling, Olsen, Olsen's brother, and another worker began to remove shingles from the roof. Kling furnished ladders and some other tools, but each worker brought his own roofing apron, nails, and hammer. Although all were experienced roofers, Kling directed them where to begin working, when to take breaks, and when to stop work for the day. He also told the crew he wanted them to work the next day, a Saturday.

On the next morning Kling and the Olsens again tore shingles from the roof. Shortly after a lunch break Kristoffer Olsen fell from the roof, sustaining spinal cord injury which resulted in quadriplegia. Several weeks later, after completion of the job, Kling paid both Olsen and his brother by checks from which he made no deduction for income or social security taxes. Kling testified that he had felt that he had the right to control the manner and method of performing the job, and the right to discharge unsatisfactory workers. Although he said that no specific hourly wage had been set before commencement of the work, he knew that a roofer expects to be paid a standard rate and that "the costs were his problem" because he was the contractor.

The factors generally considered in determining whether an employment relationship exists are well settled. They

include: the right to control the means and manner of performance; the mode of payment; the furnishing of materials or tools; the control of the premises where the work is to be done; and the right of the employer to discharge. Of these factors the right to control the means and manner of performance is the most significant. *See, e.g., Newland v. Overland Exp., Inc.,* 295 N.W.2d 615, 618 (Minn.1980). In our view the evidence strongly supports the conclusion that Kling had that right. The evidence also affords substantial support for the conclusions that Kling furnished the materials used in the job, that he had control of the premises, and that he had the right of discharge. The fact that he did not deduct income and social security taxes from the checks he gave Olsen and his brother does not compel a finding that Olsen was an independent contractor. *See Hammes v. Suk,* 291 Minn. 233, 236, 190 N.W.2d 478, 481 (1971). Overall, there is ample evidence to support the finding that Olsen was Kling's employee.

■ Kling and Western also urge that the finding concerning employee's wage is speculative. They point out that Olsen's younger brother received $600 and worked on 13 different days, while Olsen received $150 and worked a day and a half. Their argument does not take into account the fact that Olsen's brother did not work 13 full days. It is apparent that the compensation judge concluded that Olsen was receiving a daily wage of $100 at the time of injury and obtained a weekly wage of $500 by multiplying the daily wage by 5 pursuant to Minn.Stat. § 176.011, subd. 3 (1984).[1] This statute was properly applied in view of Kling's uncontroverted testimony that roofing is a seasonal business, and the finding clearly has substantial evidentiary support.

■ Similarly, the finding that Olsen has sustained an 80 percent permanent partial disability to his back has substantial evidentiary support in the testimony of Dr. John F. Bowar, specialist in physical medicine rehabilitation.

2. The final issue confronting us is whether the compensation judge correctly deferred entry of an order requiring payment of the compensation due employee and the medical expenses he incurred because of the accident. We conclude that when the compensation judge issued his decision, Minn.Stat. § 176.183, subd. 1 (1984) did impose on the special compensation fund the obligation to pay the workers' compensation benefits to which employee was entitled. That statute provides in part:

> When any employee sustains an injury arising out of and in the course of employment while in the employ of an employer * * * *not insured or self-insured* as provided for in this chapter, the employee or his dependents shall nevertheless receive benefits as provided for therein from the special compensation fund * * *.

(Emphasis added). Unquestionably, Kling was not self-insured, but we hold that he also was "not insured" at that time.

The purpose of section 176.183 is to assure that an employee entitled to compensation will receive it without delay when his employer is neither insured nor self-insured. Other provisions in the Workers' Compensation Act have the same objective of assuring payment of benefits to injured workers. Thus, Minn.Stat. § 176.191 (1984) ensures payment of compensation to an injured employee without delay when two or more employers or insurers dispute their liability to pay benefits, and Minn. Stat. § 176.001 (1984) declares the legislative intent that "chapter 176 be interpreted so as to assure the quick and efficient delivery of indemnity and medical benefits to injured workers." These provisions respond to concerns expressed by this court in *Krause v. Trustees of Hamline University,* 243 Minn. 416, 68 N.W.2d 124 (1955), where we also observed that a primary

---

**1.** This statute provides in part:
[I]n the case of the construction industry * * or other industry where the hours of work are affected by seasonal conditions, the weekly wage shall not be less than five times the daily wage.

reason for the enactment of the workers' compensation law was "to provide adequate and prompt relief to the injured employee." *Id.* at 424, 68 N.W.2d at 129.

In light of the consistent emphasis on the importance of furnishing benefits to injured workers without delay, we are convinced that the legislative intent in enacting section 176.183, subd. 1, was to require the special compensation fund to pay compensation both to an injured employee whose employer is "not insured" because he has never attempted to obtain coverage and to an injured employee whose employer is "not insured" because the alleged insurer denies that coverages exists. In both situations the plight of the employee is the same, and in neither should payment of the compensation to which he is entitled to be delayed. Consequently, we construe section 176.183, subd. 1, to require the special compensation fund to pay benefits when coverage is disputed.[2] We hold that the compensation judge erred in deferring entry of an order for payment of workers' compensation benefits to and on behalf of Olsen and reverse that part of the decision under review which affirmed that determination.

We remand for entry of an award of compensation as of the date the compensation judge's decision was filed. If the insurance coverage litigation has been finally resolved against Western, Western shall be required to pay the award. If the litigation has been resolved in Western's favor, or if it still pending, the special compensation fund shall be required to pay the award. In either event interest thereon shall be ordered pursuant to Minn.Stat. § 549.09 (1984).[3]

Employee is awarded attorney fees of $400.

Affirmed in part, reversed in part, and remanded.

---

**2.** When the special compensation fund pays compensation because of an insurance coverage dispute, and the insurer is later found to be liable for the award, the special fund will be entitled to reimbursement from the insurer of the benefits it has paid.

---

**3.** This statute controls the amount of interest to which employee is entitled, so his claims that he should be awarded interest from the date of injury or the date he filed his claim petition need not be considered.